USCA1 Opinion

 

 December 9, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1122 UNITED STATES OF AMERICA, Appellee, v. STEPHEN C. JONES, Defendant, Appellant. ____________________ ERRATA SHEET Please make the following correction in the opinion in the above case released on December 3, 1993: Page, line 2: "entences" should be corrected to read "sentences" UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1122 UNITED STATES OF AMERICA, Appellee, v. STEPHEN C. JONES, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Selya and Stahl, Circuit Judges, ______________ and Fuste,* District Judge. ______________ ____________________ Morris M. Goldings with whom Richard S. Jacobs and Mahoney, ___________________ __________________ ________ Hawkes & Goldings were on brief for appellant. _________________ Margaret D. McGaughey, Assistant United States Attorney, with _______________________ whom Jay P. McCloskey, United States Attorney, and Raymond C. Hurley, ________________ _________________ Assistant United States Attorney, were on brief for appellee. ____________________ December 3, 1993 ____________________ _____________________ *Of the District of Puerto Rico, sitting by designation. FUSTE, District Judge. Defendant Stephen C. Jones FUSTE, District Judge. _______________ was convicted of conspiracy to defraud two federally insured banks and to transport forged securities in interstate commerce in violation of 18 U.S.C. 2314 (Count 1), bank fraud in violation of 18 U.S.C. 1344 (Counts II and III), and the interstate transportation of forged securities in contravention of 18 U.S.C. 2314 (Counts IV and V). Jones argues on appeal that (1) a UCC-3 release of collateral form is not a "security" as defined by pertinent statute and his conviction on Counts IV and V should, therefore, be reversed; (2) the judge incorrectly gave a willful blindness instruction as to Jones' intent; (3) there was insufficient evidence to support the verdicts; (4) the court erroneously denied a motion to sever Jones' trial from that of his codefendant, and (5) the sentence was overly severe and was incorrectly based on Jones' occupation as an attorney. We conclude that a UCC-3 release of collateral form is not a security as provided for in the applicable statute, the willful blindness instruction was correctly given, and the denial of the motion for severance was not an error. We reverse the conviction on Counts IV and V and the consecutive ten-year sentence imposed for the transportation of forged securities. We find that there was sufficient evidence to support Jones' -2- 2 conviction on Counts I, II, and III and therefore the five-year concurrent sentences imposed on those counts shall stand. I. I. Background Background __________ Viewing the evidence in the light most favorable to the government, see United States v. Rivera-Santiago, 872 F.2d 1073, ___ ________________________________ 1078-79 (1st Cir.), cert. denied, 492 U.S. 910 (1989), the _____________ following facts were established at trial. During the early 1970s, defendant Stephen C. Jones, together with his father Allan and Jones' codefendant, Robert Welch, formed a holding company called Iyanough Management, which over the years acquired a number of hotels, motels, and other property. In 1985, Iyanough Management entered into a partnership known as Armory Hotel Associates with a group of contractors and developers in Maine. The purpose of the partnership was to convert an old armory building in Portland, Maine, into the Portland Regency Inn. The renovations were financed through a loan from Patriot Bank for $8.2 million, which was secured by a mortgage of the building and a security interest covering the furniture, fixtures, and equipment of the hotel. A further cash infusion into the project was obtained from the Berkshire Saving Bank in the form of a $2 million irrevocable line of credit, which was secured by a second mortgage on the building and a second security interest in the -3- 3 furniture, fixtures, and equipment of the hotel. As a part of the original mortgage agreement with the two banks, Armory Hotel Associates signed a UCC-1 form with each bank. This form is a financing statement which certifies that a party holds a security interest in particular property. The UCC-1 is filed with the Secretary of State's office so that any later parties will be aware that there is an encumbrance upon the property. Each of the mortgage agreements with the banks provided that no additional encumbrances upon the collateral could be incurred, and in the event that any part of the security was sold or transferred, the entire mortgage debt would be due and payable on demand. As one of the partners in the Armory Hotel Associates, Jones signed the notarized mortgage security agreements with both banks. Beginning in 1987, Iyanough Management began to experience financial difficulties. As a measure to generate cash flow, a sale and lease back of the furniture, fixtures, and equipment of the Portland Regency Inn was negotiated through broker David Mudie. Mudie was originally led to believe that Iyanough Management owned the Portland Regency and its furniture, fixtures and equipment. Through a search with the Secretary of State's Office, Mudie found out that Armory Hotel Associates actually owned the hotel and its contents, and discovered the -4- 4 lien on the fixtures, furniture and equipment. As a result, in order to complete the sale and lease back, Kansallis Finance Ltd., the group financing the transaction, required that a release of the security interests of Berkshire County Savings Bank and Patriot Bank be perfected through the filing of UCC-3 forms. A UCC-3 is a document which can be used to release a security interest in certain property which has been memorialized in a UCC-1.1 Welch induced employees of Iyanough Management to forge the signatures of the loan officers of the two banks on the release forms. The two forged documents, purporting to release the interest of the two banks, were filed with the Secretary of State's office in Maine in August 1987. Welch also directed an employee to forge the signature of one of the Maine partners of the Armory Hotel Associates on various other forms required by Kansallis. One of Kansallis' prerequisites for the closing was an opinion letter from counsel for Armory Hotel Associates opining that Kansallis was receiving a first security interest in the collateral consisting of the furniture, fixtures, and equipment. Two drafts of the opinion letter were sent to Jones at his law firm by the attorney for Kansallis. The final opinion letter was ____________________ 1A UCC-3 can also be used to continue, assign or amend a security interest. When we discuss the document in this case, we are referring to its use as a release of a security interest. -5- 5 returned to Kansallis' counsel on the letterhead of Jones' law firm, and was signed by John Aufiero, counsel for Iyanough Management. Aufiero testified at trial that he was given the form by Jones to sign. David Mudie testified that he spoke with Jones several times about the transaction and the documents necessary to complete the arrangement. When the transaction was completed, the sum of $1,288,533 was wired to Iyanough Management's account. Approximately $290,000 of the proceeds of the loan were eventually transferred into an account in Jones' name. FBI Agent James Osterrieder interviewed Jones as part of his investigation of the forged documents. During the interview, Jones stated that initially it was his idea to carry out the sale and lease back of the furniture, fixtures, and equipment, in order to generate cash. Jones stated that he knew that the banks had a lien on the equipment, but thought that there was a clause in the closing document which would allow for the sale and lease back. Jones also told the agent that he and Welch had discussed the need for a UCC-3 release of interest before the sale and lease back could proceed, but that Welch said that he would take care of the problem. Jones admitted that he had seen a draft of the opinion letter which was required by Kansallis to consummate the sale and lease back deal, and that he -6- 6 arranged to have Aufiero sign the letter because Jones was out of town at the time. Robert Welch pled guilty to bank fraud and interstate transportation of forged securities, and proceeded to trial on the conspiracy charge. At trial, Welch testified that he completed the arrangement for the sale and lease back without telling Jones the details of the transaction, and that Jones never questioned Welch about the deal. Both defendants argued that Welch, working alone, caused the UCC-3 documents to be forged by Iyanough Management employees and filed with the Secretary of State. Welch was found guilty of conspiracy and Jones was found guilty on all counts. II. II. Discussion Discussion __________ A. Release of Collateral as a Security Interest A. Release of Collateral as a Security Interest ____________________________________________ Jones first argues that a UCC-3 is not a "security" for the purposes of 18 U.S.C. 2314. 18 U.S.C. 2311 defines the term "security" as used in 2314.2 The district court found, ____________________ 2Section 2311 provides: "[S]ecurities" includes any note, stock certificate, bond, debenture, check, draft, warrant, traveler's check, letter of credit, warehouse receipt, negotiable bill of lading, evidence of indebtedness, certificate of interest or participation in any profit- sharing agreement, collateral-trust -7- 7 and the government argues, that a UCC-3 is analogous to an "instrument or document or writing . . . transferring or assigning any right, title or interest in or to goods, wares and merchandise." We disagree and hold that a UCC-3 release of collateral is not a "security" for the purpose of 18 U.S.C. 2314. Statutory interpretation is a question of law and, therefore, is subject to de novo review. United States v. _________________ Taylor, 802 F.2d 1108, 1112 (9th Cir. 1986), cert. denied, 479 ______ _____________ U.S. 1094 (1987). It has been found that Congress intended a broad definition of securities in the context of outlawing the transportation of falsely made or forged securities in interstate commerce. United States v. Speidel, 562 F.2d 1129, 1131 (8th _________________________ Cir. 1977), cert. denied, 435 U.S. 915 (1978). An analysis of ____________ ____________________ certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate; valid or blank motor vehicle title; certificate of interest in property, tangible or intangible; instrument or document or writing evidencing ownership of goods, wares, and merchandise, or transferring or assigning any right, title, or interest in or to goods, wares, and merchandise; or in general, any instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, warrant, or right to subscribe to or purchase any of the foregoing or any forged, counterfeited, or spurious representation of any of the foregoing. -8- 8 the cases applying the definition of "security" under section 2314, however, does not result in a clear picture of exactly what is encompassed in this broad definition, or how to proceed in determining whether novel instruments should also be included. The district court relied upon Speidel, supra, in _______ _____ support of its finding that a UCC-3 is a security. In Speidel, _______ the Eighth Circuit held that a quitclaim deed is a security. The court found that although a quitclaim deed is not the type of item normally considered as a security by the commercial and financial community, such an instrument is an express conveyance of whatever interest and title the grantor has in a piece of property. Although it warrants no specific interest in property, it does transfer some interest in property. Such a deed may be used to convey interests in land, to clear title to land encumbered by liens or to transmit full title to land by conveying the grantor's entire interest to any grantee. After a quitclaim deed is conveyed, the grantee holds the entire interest which the grantor had owned. We are unable to agree with the district court that a UCC-3 is analogous to a quitclaim deed. Unlike a quitclaim deed, the UCC-3 at issue in this case is not effective by itself to transfer or assign a title, right or interest in or to property. -9- 9 At most, one could argue that the UCC-3 transfers an interest from the secured party back to the owner of the property. This is a much more constrained purpose than the potential uses of a quitclaim deed, and only permits a transfer of a limited interest to one particular party, the original owner. The sole result of the filing of a UCC-3 is that the owner of the property has a title free of encumbrances and can proceed to transfer the lien free property to another party. In this case, the UCC-3 was merely one step in the process of transferring an interest in the fixtures, furniture, and equipment to a third party, and was insufficient on its own to convey title to the items listed. Furthermore, a UCC-3 does not contain the same qualities as other documents which have been deemed securities. In determining whether an instrument is a security, other courts have examined factors such as whether the document evidences an obligation for the payment of money or represents a particular interest in goods or property and has inherent value, United ______ States v. Canton, 470 F.2d 861, 863 (2d Cir. 1972); whether the _________________ instrument has intrinsic value and is recognized and treated as having intrinsic value in the regular channels of commerce, and whether the document could be sold, United States v. Wexler, 621 _______________________ F.2d 1218, 1224 (2d Cir.), cert. denied, 449 U.S. 841 (1980); ____________ whether the item could be used as collateral and represents an -10- 10 acknowledgment of a debt owed or a contractual obligation to pay in the future, United States v. Austin, 462 F.2d 724, 736 (10th ________________________ Cir.), cert. denied, 409 U.S. 1048 (1972); and whether the ____________ document purports to be valuable and is sufficient to establish a given right, relationship or property interest. United States v. ________________ Johnson, 700 F.2d 163, 175 (5th Cir. 1983). _______ The effect of the forged UCC-3 release here was only to terminate the security interest which the two banks held in the fixtures, furniture, and equipment of the Portland Regency Inn. By itself, a document of release has no value, and does not represent a tangible or intangible valuable property right. Such a form could not be sold or used as collateral. It does not represent an acknowledgment of a debt owed or a contractual obligation to pay in the future. The form was valuable only to the Armory Hotel Associates and not to any third party. A UCC-3 serves merely to terminate and not to transfer or assign any property interest. In addition, we recognize that when, as in this case, there is ambiguity in a criminal statute, such ambiguity should be construed in favor of the defendant. United States v. __________________ Borowski, 977 F.2d 27 (1st Cir. 1992). Because we hold that a ________ UCC-3 is not a security as defined for the purposes of 18 U.S.C. 2314, Jones' conviction on two counts of interstate -11- 11 transportation of forged securities pursuant to this section must be reversed. B. Willful Blindness Instruction B. Willful Blindness Instruction _____________________________ Next, Jones objects to the "willful blindness" instruction given to the jury, arguing that there was no evidence that he was aware that a crime was likely in progress and no evidence that he facilitated it. A willful blindness instruction is appropriate when (1) defendant claims a lack of knowledge; (2) the facts suggest a conscious course of deliberate ignorance, and (3) the instructions, taken as a whole, cannot be misunderstood by a juror as mandating an inference of knowledge. United States v. St. Michael's Credit Union, 880 F.2d 579, 584 _____________________________________________ (1st Cir. 1989). Here, the first element is obviously present since Jones claims that he was ignorant of any wrongdoing. The second requirement may be established from the evidence adduced at trial. Jones, as one of the partners, signed the original mortgage agreements with Patriot Bank and Berkshire County Savings Bank. By signing these agreements, he displayed knowledge of the encumbrances placed on the fixtures, furniture, and equipment of the Portland Regency Inn. He also would have known that the agreements provided that Armory Hotel Associates could not incur any additional encumbrances on the collateral, and that the mortgage would become due and payable if any of the -12- 12 collateral was sold or transferred. There was evidence produced at trial that Jones and Welch discussed the need to obtain cash for Iyanough Management, and the possibility of obtaining such cash through a deal with Mudie involving a sale of the furniture, fixtures, and equipment of the Portland Regency Inn. There was evidence that Mudie discussed the deal with Jones and that Rodr guez, the lawyer for Kansallis, sent documents to Jones regarding the deal, including drafts of the opinion letter. In its final form, this opinion letter represented, among other things, that the firm was acting as counsel for Armory Hotel Associates and that there were no other encumbrances on the furniture, fixtures, and equipment so that Kansallis' security interest was perfected. Furthermore, John Aufiero testified that Jones brought him the opinion letter on the letterhead of Jones' law firm, and requested that Aufiero sign the document. Testimony by the FBI agent established that initially it was Jones' idea to arrange the sale and lease back of the furniture, fixtures, and equipment. Jones told the agent that he was aware of the banks' liens on the equipment but felt that there was some way out of them. According to Jones, Welch later told Jones that Welch did not think that the bank would release the collateral, but that Welch would take care of it. The day after the money came through from Mudie and Kansallis, there was -13- 13 evidence that Jones personally received checks totalling approximately $290,000. This evidence, taken in the light most favorable to the government, is sufficient for a jury to conclude that Jones knew about the deal with Kansallis and Mudie, and knew that such a deal would not be able to go forward without a release of the prior security interests held by the two banks in the furniture, fixtures, and equipment of the Portland Regency Inn. Moreover, there is sufficient evidence from which a jury could conclude, that Jones knew both (1) that the banks would not release their interests unless their mortgages were paid in full, and (2) that the opinion letter was an alternative means of representing to Kansallis that the property was no longer encumbered by any prior liens. Even if, as Welch testified, Jones was unaware of the actual steps taken by Welch to release the security interest, we find that the facts established at trial suggest that this lack of knowledge could have been due to a conscious course of deliberate ignorance on the part of Jones. The jury instruction given was not likely to give jurors the impression that they were compelled to make an inference of knowledge on the part of Jones. The judge instructed the jury [t]hat in considering whether defendant Stephen Jones knowingly committed any -14- 14 offense, you may infer but are not required to infer, knowledge on his part from a combination of suspicion and indifference to the truth if you find beyond a reasonable doubt that to have existed on his part. [sic] If you find that he had a strong suspicious [sic] that things were not what they seemed, or that someone had withheld some important facts, yet that he shut his eyes for fear of what he would learn, you may conclude that he acted knowingly . . . . With regard to any such inference you must reason with care. You may not draw this inference or knowledge from negligence or mistake. I instruct you that negligence, even gross negligence, is not a proper basis to support a finding of wilfulness, or to support a finding of knowledge, nor is error or mistake . . . I'm not suggesting one way or the other how you should find with respect to this matter. I am not suggesting that you make any such finding, or that if you do, what the finding should be. I'm simply telling you . . . that you may infer knowledge if you find willful blindness to a fact to have occurred. This instruction clearly did not mandate a finding of knowledge on the part of the jury. Jones objects that the court failed to utilize the instructions on willful blindness which the defendant offered, arguing that his wording "more properly put such instruction in the proper context for the jury." The failure to give a requested jury instruction is reversible error only if "the requested instruction is substantially correct, was not substantially covered in the charge actually given, and covers an important point in the trial so that the failure to give it -15- 15 seriously impaired the defendant's ability to present a given defense." United States v. Nason, No. 92-2303, slip op. at 11 _______________________ (1st Cir. July 9, 1993) (citing United States v. Newton, 891 F.2d _______________________ 944, 949 (1st Cir. 1989)). Jones' argument fails under this test. Although his requested instruction is substantially correct, Jones fails to point out in what manner his instructions were superior to those given, and a comparison of the two sets of instructions shows no material difference in what was conveyed to the jury. There is no suggestion that an important point was not conveyed by the given instructions. We find no error in the judge's declining to adopt Jones' suggested instructions. C. Sufficiency of the Evidence C. Sufficiency of the Evidence ___________________________ Jones argues that there was insufficient evidence to sustain his conviction. In order to successfully challenge the sufficiency of the evidence on appeal, a defendant must show that no reasonable jury could have found him guilty beyond a reasonable doubt. United States v. Innamorati, 996 F.2d 456, 469 ___________________________ (1st Cir. 1993). On appeal, we must view the evidence in the light most favorable to the government, "drawing all plausible inferences in its favor and resolving all credibility determinations in line with the jury's verdict." United States _____________ v. David, 940 F.2d 722, 730 (1st Cir.), cert. denied, U.S. ________ ____________ ___ __ -16- 16 (1991). We will examine the conspiracy and bank fraud charges in turn. 1. Conspiracy Charge 1. Conspiracy Charge _________________ Conviction of conspiracy requires proof that the defendant entered into an agreement with another to commit a crime; the agreement need not be express but may be implicit in a working relationship. Innamorati, 996 F.2d at 470. The __________ government must prove two kinds of intent: intent to agree and intent to commit the crime. However, "[t]he government need not prove that a co-conspirator knew all of the details or participated in all of the objectives of the plan." United ______ States v. G mez-Pab n, 911 F.2d 847, 853 (1st Cir. 1990), cert. _____________________ _____ denied, 498 U.S. 1074 (1991) (citations omitted). ______ In order to convict Jones of conspiracy to commit bank fraud,3 the prosecution must show that Jones and Welch agreed to defraud Patriot Bank and Berkshire County Savings Bank. Jones argues that the fraud perpetrated upon the banks was completed on July 23, 1987, when the forged UCC-3 forms were filed with the Maine Secretary of State, and that the only direct evidence connecting Jones to any fraudulent activity was the opinion ____________________ 3Our disposition of this appeal renders moot any discussion of the part of the charge for conspiracy to transport forged securities in interstate commerce. For that reason, we limit the analysis to the sufficiency of the charge for conspiracy to commit bank fraud. -17- 17 letter dated August 10, 1987. This claim, however, ignores the evidence that Jones knew about the possibility of the sale and lease back arrangement, and discussed with Welch the need to obtain releases from the two banks. From this, the jury could have inferred that even if Jones did not have actual knowledge that Welch was forging the UCC-3 forms, he knew that there was a need to obtain a release from the banks, he was aware that the bank would not allow such a release unless the mortgage was paid in full, and he knew that somehow Welch was going to "take care of it." Based on this evidence, a reasonable jury could conclude that even if there was no express agreement, Jones sat passively by and let his partner proceed with the sale and lease back, knowing that the transaction could not be completed legally and would effect a fraud on the new lender. 2. Bank Fraud Charges 2. Bank Fraud Charges __________________ In order to convict Jones of bank fraud under 18 U.S.C. 1344(1), the jury had to find beyond a reasonable doubt that Jones "engaged in or attempted to engage in a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss." United States v. Ragosta, 970 F.2d 1085, 1089 (2d Cir.), _________________________ cert. denied, U.S. (1992) (quoting United States v. _____________ ____ ____ ________________ -18- 18 Stavroulakis, 952 F.2d 686, 694 (2d Cir. 1992)). The element of ____________ intent can be established through circumstantial evidence and inferences drawn from evidence presented at trial. Id. at 1090. ___ The same evidence which serves to sustain a conviction for conspiracy to commit bank fraud will suffice to affirm Jones' conviction for bank fraud under a willful blindness theory. Jones knew that a sale and lease back of the furniture, fixtures, and equipment was being planned. He knew that Kansallis required a release of the banks' interest and that such a release would not be granted unless the mortgage was paid off. Even if, as Welch testified, Jones never found out about the forgery and just trusted Welch to work out a deal which would provide the desperately needed cash, a rational jury could have concluded that Jones deliberately shut his eyes to what was occurring. "The purpose of the willful blindness theory is to impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps." United States v. Rothrock, 806 F.2d 318, __________________________ 323 (1st Cir. 1986). The evidence presented at trial was sufficient for a conviction on the counts of bank fraud. D. Motion to Sever D. Motion to Sever _______________ -19- 19 Jones moved for severance of his trial from that of codefendant Welch under Fed. R. Crim. P. 14.4 The court denied his motion, holding that Jones failed to persuasively demonstrate that he would incur prejudice at trial as a result of the joinder. Jones appeals the denial, arguing that he was a victim of the prejudicial spillover of evidence against his codefendant, who had already pled guilty to the substantive counts charged. In addition, Jones suggests that the jury may have held him to a higher standard than Welch since Jones was an attorney. Finally, Jones argues that the joinder improperly placed him in a position where, in order to exercise his Fifth Amendment privilege against self-incrimination, he was forced to accept an adverse jury inference. The grant or denial of a motion for severance is left to the discretion of the trial court and will only be disturbed for an abuse of that discretion. United States v. Porter, 764 ________________________ F.2d 1, 12 (1st Cir. 1985). For reasons of judicial economy, co- ____________________ 4Fed. R. Crim. P. 14 provides in part: If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. -20- 20 conspirators are generally tried together absent a strong showing of prejudice. United States v. Perkins, 926 F.2d 1271, 1280 (1st ________________________ Cir. 1991). In order to obtain a severance, a defendant must show that substantial prejudice, amounting to a miscarriage of justice, would result from a joint trial. United States v. _________________ Sabatino, 943 F.2d 94, 96 (1st Cir. 1991). Mere speculative ________ allegations as to possible prejudice from joinder do not sustain the burden of showing an abuse of discretion in denying a motion for severance. Jones failed to show that the presence of Welch at trial was so prejudicial as to warrant severance. Welch argued at trial that there was no conspiracy between Jones and him because Welch operated on his own to perpetrate the fraud upon the banks and the transportation of the forged documents. Several times on the stand Welch emphasized that he was the only one responsible for the criminal acts. Such evidence could only be helpful to Jones' claim that he had no knowledge of Welch's activity. Jones' claim of a spillover effect is also unavailing. The danger which is to be prevented is that the jury will be unable to separate the evidence against different defendants or that evidence which is admissible against only one defendant will be used by the jury against a co-conspirator. See Perkins, 926 ___ _______ -21- 21 F.2d at 1281. Usually, however, any prejudice caused by joinder is best dealt with through instructing the jury to give individual consideration to each defendant. United States v. _________________ Bruner, 657 F.2d 1278 (D.C. Cir. 1981). Here, there is no ______ evidence, and Jones has not identified any, that the jury was unable to evaluate separately and fairly the guilt or innocence of each defendant. The judge instructed the jury that a guilty plea by Welch could not be considered as evidence against Jones, and also noted that each defendant should be given separate consideration. He informed the jury that any evidence which was admitted solely against one defendant could not be considered against the other defendant. Jones argues that the jury may have held him to a higher standard of conduct than Welch because he is an attorney. However, Jones presents no evidence that his occupation caused the jury to view him more harshly. In any event, Jones could have requested a special jury instruction that attorneys are held to the same standard of conduct as others, and failed to do so. See United States v. Picciandra, 788 F.2d 39, 46 (1st Cir.), ___ ____________________________ cert. denied, 479 U.S. 847 (1986). ____________ Finally, Jones claims that the joinder, combined with the willful blindness instruction, forced him to risk an adverse inference on the part of the jury by exercising his Fifth -22- 22 Amendment privilege not to testify. In Porter, we rejected the ______ argument that the antagonistic defense of a codefendant was grounds for severance of trial because it would force the defendant to testify in violation of the Fifth Amendment. 764 F.2d at 14. The need for severance to protect Jones' Fifth Amendment rights was even more minimal, since Welch's defense was completely in line with Jones' claim of innocence. The joinder had no impact on Jones' Fifth Amendment rights and there was no abuse of discretion in the trial court's refusal of the motion to sever. E. Severity of Sentence E. Severity of Sentence ____________________ Jones objects to the length of the fifteen-year sentence by the trial court. He argues that a five-year sentence would be appropriate for a first time offender such as himself. Because we reverse Jones' conviction for the interstate transportation of forged securities, his sentence is reduced to five years for conspiracy to commit bank fraud and five years each for two counts of bank fraud, to be served concurrently. We see no reason to alter Judge Carter's assessment and pre- guideline sentencing on Counts I, II, and III. Therefore, the sentence on the remaining counts will stand as crafted by the trial judge. See United States v. Jim nez-Rivera, 842 F.2d 545, ___ ________________________________ 548 (1st Cir.), cert. denied., 487 U.S. 1223 (1988). ____________ -23- 23 III. III. Conclusion Conclusion __________ Because we hold that a UCC-3 is not a "security" for the purpose of 18 U.S.C. 2314, Jones' conviction on Counts IV and V for the interstate transportation of forged securities is reversed. Sufficient evidence was adduced at trial to convict reversed ________ Jones of conspiracy and bank fraud on Counts I, II, and III, and the trial court did not abuse its discretion by denying the motion to sever Jones' trial from that of his codefendant. For these reasons, Jones' convictions for conspiracy and bank fraud are affirmed. affirmed ________ -24- 24