UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2287

ROBERT B. REICH, ETC.,

Plaintiff, Appellee,

v.

CAMBRIDGEPORT AIR SYSTEMS, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Bailey Aldrich,* Senior U.S. Circuit Judge]

Before

Breyer,** Chief Judge,

Campbell, Senior Circuit Judge,

and Cyr, Circuit Judge.

Barry C. Klickstein with whom Herbert Abrams, Sandra J.

McLaughlin and Abrams, Roberts, Klickstein & Levy were on brief for

appellant.
Edward D. Sieger, Senior Appellate Attorney, Thomas S.

Williamson, Jr., Solicitor of Labor, Allen H. Feldman, Associate

Solicitor for Special Appellate and Supreme Court Litigation, and
Nathaniel I. Spiller, Counsel for Appellate Litigation, United States

Department of Labor, were on brief for appellee.

June 20, 1994

*Of the First Circuit, sitting by designation.

**Chief Judge Stephen Breyer heard oral argument in this matter, but
did not participate in the drafting or the issuance of the panel's
opinion. The remaining two panelists therefore issue this opinion
pursuant to 28 U.S.C. 46(d).

CAMPBELL, Senior Circuit Judge. The Secretary of

Labor ("the Secretary") brought this retaliatory discharge

action in the United States District Court for the District

of Massachusetts pursuant to Section 11(c) of the

Occupational Safety and Health Act of 1970 ("the OSH Act"),

29 U.S.C. 660(c). The Secretary's complaint alleged that

defendant-appellant Cambridgeport Air Systems

("Cambridgeport") violated the OSH Act in June 1989 by

discharging two employees, Peter Richardson and Shawn Roche,

because they had complained about health and safety problems

at Cambridgeport's Salisbury, Massachusetts plant.

Richardson had been employed by the defendant as a welder;

Roche was a general shipper-trainee.

The claim was tried by the court over five days in

May 1993. In a written opinion, the district court found

that the defendant-appellant had discharged Richardson

because of his protected activities. The court awarded

Richardson back pay and then doubled this award, as the

Secretary had requested, to "cover additional damage plus

prejudgment interest." The total amount awarded to

Richardson was $104,968.

The court found that Roche was not discharged for

his own protected activity. Rather, the court found that he

was terminated because "he was a special friend of

Richardson's," that his discharge was "a house-cleaning

-3-

proposition," and that he "would not have been discharged but

for his connection with Richardson." As with Richardson's

award, the court awarded Roche an amount equal to twice his

lost back pay, a total of $88,552.

Cambridgeport appeals, and we affirm.

I.

Cambridgeport does not appeal from the district

court's ruling that Richardson was terminated because of his

protected activities. Rather, Cambridgeport argues that the

district court erred in finding that Roche's termination was

retaliatory, and in calculating the back pay damages for both

Richardson and Roche. As both determinations depend on

findings of fact, we may set them aside only if "clearly

erroneous." Fed. R. Civ. P. 52. We are required to give

"due regard" to the "opportunity of the trial court to judge

the credibility of the witnesses." Id. Under this

deferential standard, we must accept a district court's

account of the evidence if it is "plausible in light of the

record viewed in its entirety . . . . Where there are two

permissible views of the evidence, the factfinder's choice

between them cannot be clearly erroneous." Anderson v.

Bessemer City, 470 U.S. 564, 574 (1985).

A.

-4-

Cambridgeport contends that Roche was terminated

for valid work reasons, not in retaliation for his

association with Richardson. Roche admitted at trial that he

had made mistakes at work and had been reprimanded. Roche's

supervisors also testified that his work performance was

poor. Cambridgeport contends that the only evidence in

support of the court's explanation for Roche's discharge came

from Roche himself, whose testimony was not deemed credible

in other respects by the district court.1

It is true that the district court was unwilling to

credit Roche's testimony that he had joined Richardson in

complaining about safety and health matters. Still, there

was sufficient evidence to support the court's finding that

Roche was terminated because of his connection with

Richardson. There was evidence that Roche and Richardson

were particularly close friends and that management was aware

of this. Roche's supervisor had warned Roche not to raise

safety concerns. In addition, Roche's termination followed

less than a week after Richardson's, at a time when Roche,

according to his testimony, was sufficiently concerned about

his job security to bring a tape recorder to work. Moreover,

the court was unimpressed by Cambridgeport's asserted reasons

for Roche's discharge. Cambridgeport's witnesses, it said,

1. Cambridgeport concedes that the OSH Act would prohibit
Roche's termination if in fact he was discharged because of
his relationship with Richardson.

-5-

had "greatly exaggerated" their accounts of Roche's problems

at work.

Given its adverse assessment of the credibility of

Cambridgeport's witnesses, and the close and visible

connection between Richardson and Roche, the district court

felt that the most likely explanation for Roche's discharge

was that Cambridgeport wanted to "get rid of the smaller fry,

and impress the other employees" not to associate with health

and safety activists. While not the only possible one, this

view of the evidence was "plausible in light of the record

viewed in its entirety." Anderson, 470 U.S. at 574.

Questions of witness credibility are particularly for the

trier to resolve. United States v. Olea, 987 F.2d 874, 876

(1st Cir. 1993). We cannot say the court clearly erred in

finding that Roche was discharged because of his connection

with Richardson.

B.

The parties stipulated that the period of back pay

at issue was from the June 1989 dates of discharge until

December 12, 1991. The district court calculated the damages

for both employees based on the assumption that, but for

their retaliatory discharges, they both would have retained

their jobs for this entire period. Cambridgeport argues that

this calculation was clearly erroneous and not supported by

the evidence. Cambridgeport insists that its work is

-6-

cyclical, and that given Richardson's lack of general sheet

metal workers' skills and Roche's poor work history, both

employees would have been laid off long before December 1991.

Again, the district court's findings depended in

large part on its determination that Cambridgeport's

witnesses lacked credibility. The district court did not

believe the Cambridgeport witnesses' assertions that the work

for which Richardson had been hired "fell off," nor did it

believe that his work performance was unsatisfactory. In the

court's view, the defendant's reasons for limiting its

liability vis-a-vis Richardson were "likely trumped up."

There was evidence that Richardson's ability and character

were, overall, in the words of the court, "satisfactory," and

that less than a week after his discharge, the company hired

a new employee to do the exact work that Richardson had been

doing. Moreover, there was evidence that Richardson could do

non-welding work and could have been transferred to such work

if the "pure welding" work "fell off."

There was also sufficient evidence in the record

for the court to disbelieve Cambridgeport's contention that

Roche would have been laid off soon after June 1989 "in

accord with the cyclical swings of employment, and not

rehired." Cambridgeport placed an advertisement in the local

newspaper for "shop laborers" on the day Roche was discharged

-7-

and subsequently hired workers in the department where Roche

worked.

On reading the record as a whole, we cannot say the

court's view of the evidence was implausible. It was not,

therefore, clear error for the court to calculate the

employees' back pay award on the basis of an assumption that,

but for their retaliatory discharges, they both would have

retained their jobs for the entire stipulated period.

II.

The Secretary advanced the view at trial that the

appropriate measure of damages for both employees was an

amount equal to twice their back pay losses. The Secretary

argued to the district court that doubling back pay losses

would not be a penalty, but would serve "to compensate[] for

the effects of loss of pay upon the victim[s]."

The court adopted the Secretary's measure of

damages, saying that "the conduct of this defendant, both in

and out of court, is so consistently brash that [the court]

feels justified in finding doubling the lost wages award, but

to serve to cover additional damage plus prejudgment

interest." The court later supported its doubling of the

award by "calling for special support of the statutory

purpose when an employer flaunts it both by word and by

openly unambiguous conduct."

-8-

Cambridgeport argues that doubling the back pay

award amounted to an award of punitive, or exemplary,

damages, and was unauthorized by the OSH Act. It insists

that courts interpreting the statute have uniformly limited

recovery in cases of retaliatory discharge to back pay,

employment search expenses, and in some instances,

prejudgment interest. The Secretary contests the

characterization of the award as exemplary. He argues that

the court's statement that double wages served "to cover

additional damage plus prejudgment interest" shows an

intention to grant compensatory damages, and that the record

supports the award on that basis. The Secretary concedes

that this is the first reported case in which double damages

have been awarded under the OSH Act. But he insists that the

case also represents the first time the Secretary has

actually asked for such damages.

A.

The question of whether the district court was

within its authority to authorize double back pay damages

turns on an interpretation of Section 11(c) of the OSH Act,

29 U.S.C. 660(c). This is a question of law, subject to

our review de novo. United States v. Jones, 10 F.3d 901, 904

(1st Cir. 1993).

The relevant provision reads:

Any employee who believes that he has been
discharged or otherwise discriminated against

-9-

by any person in violation of this subsection
may . . . file a complaint with the Secretary
alleging such discrimination. . . . If [after
appropriate] investigation, the Secretary
determines that the provisions of this
subsection have been violated, he shall bring
an action in any appropriate United States
district court against such person. In any
such action the United States district courts
shall have jurisdiction, for cause shown to
restrain violations . . . and order all

appropriate relief including rehiring or

reinstatement of the employee to his former
position with back pay.

29 U.S.C. 660(c)(2) (emphasis added). We must decide

whether the district court's awarding of damages equal to

twice the employees' lost back pay was "appropriate relief"

within the meaning of the statute and under the facts of the

case.

The Secretary urges that we interpret 11(c) in

the light of Franklin v. Gwinnett County Public Sch., 112 S.

Ct. 1028, 1032 (1992). In Franklin, the Supreme Court ruled

that federal courts may award monetary damages in private

actions brought to enforce Title IX of the Education

Amendments of 1972, 20 U.S.C. 1681-1688 ("Title IX"). Id.

at 1038. Congress did not explicitly provide for private

actions in Title IX; however, the right to bring private

actions was earlier "implied" by the Court in Cannon v.

University of Chicago, 441 U.S. 677 (1979). Even absent an

express right to sue, monetary damages were held to be

available because the Court "presume[s] the availability of

all appropriate remedies unless Congress has expressly

-10-

indicated otherwise." Franklin, 112 S. Ct. at 1032. The

Court announced "[t]he general rule . . . that absent clear

direction to the contrary by Congress, the federal courts

have the power to award any appropriate relief in a

cognizable cause of action brought pursuant to a federal

statute." Id. at 1035 (emphasis added).

The instant case differs from Franklin in that we

are here construing Congress's meaning when, in creating an

express cause of action for the Secretary of Labor to

institute on behalf of an aggrieved employee, it licensed

courts to "order all appropriate relief." In Franklin, "all

appropriate remedies" were the Court's words, not Congress's.

Nonetheless, the parallel is unmistakable. It is hard to

believe that the Supreme Court having presumed that an

implied private right of action included "all appropriate

remedies" or "any appropriate relief," and having construed

remedies so described to include "monetary damages" and "any

of the procedures or actions normally available

. . . according to the exigencies of the particular case,"

112 S. Ct. at 1034 would construe less generously

Congress's similar phrase, "all appropriate relief." We

think Franklin strongly suggests that "all appropriate

relief" as written in 11(c) embraces monetary damages as

well as other relevant forms of relief normally available,

-11-

Congress having provided no "clear direction" to the

contrary. See 112 S. Ct. at 1035.

Cambridgeport, nonetheless, would have us find here

"clear direction to the contrary" because the phrase "all

appropriate relief" is succeeded by the words, "including

rehiring or reinstatement of the employee to his former

position with back pay." This, we are told, evinces a

Congressional intent to limit relief to those remedies

expressly mentioned, or at least to the kinds of remedies

mentioned. Cambridgeport contends that given the express

delineation of certain remedies, "[t]here is nothing to

suggest that Congress affirmatively intended [] an expansive

interpretation" of 11(c), and that double damages are

therefore unauthorized under the OSH Act.

However, the key language of the OSH Act is broad.

It authorizes a court to "order all appropriate relief." The

further language including certain remedies, like

reinstatement, indicates the availability of the named

remedies, but does not purport to limit "all appropriate

relief" to those remedies only. The mere naming of certain

included remedies neither suggests nor is a "clear direction"

that other remedies are precluded. See Franklin, 112 S. Ct.

at 1035; Federal Land Bank of St. Paul v. Bismark Lumber Co.,

314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one

-12-

of all-embracing definition, but connotes simply an

illustrative application of the general principle.").

We conclude that the phrase "all appropriate

relief" under 11(c) includes "monetary damages" as

specifically held in Franklin. Moreover, given the expansive

language in Franklin ("[t]he general rule . . . that absent

clear direction to the contrary by Congress, the federal

courts have the power to award any appropriate relief in a

cognizable cause of action brought pursuant to a federal

statute," 112 S. Ct. at 1035), it is difficult to exclude

even exemplary damages where otherwise justified in

particular circumstances. Later, analogous federal statutes

protecting "whistleblowers" expressly list exemplary damages

as within the rubric of "all appropriate relief." For

example, 42 U.S.C. 5851 protects whistleblowers in nuclear

facilities from retaliatory discharge and discrimination.

The jurisdiction provision of the statute provides in

relevant part:

In actions brought under this subsection,
the district courts shall have
jurisdiction to grant all appropriate
relief including, but not limited to,
injunctive relief, compensatory relief,
and exemplary damages.

42 U.S.C. 5851(d). See also 15 U.S.C. 2622(d) (toxic

substances) ("In actions brought under this subsection, the

district courts shall have jurisdiction to grant all

appropriate relief, including injunctive relief and

-13-

compensatory and exemplary damages."); 42 U.S.C. 300j-

9(i)(4) (safety of public water systems) (courts may "grant

all appropriate relief including, but not limited to,

injunctive relief, compensatory, and exemplary damages"); 42

U.S.C. 7622(d) (air pollution) (courts may grant "all

appropriate relief including, but not limited to, injunctive

relief, compensatory, and exemplary damages").

By expressly identifying exemplary damages as

authorized under these similar statutes, Congress recognizes

exemplary damages as falling within the term "all appropriate

relief." To be sure, the express mention of exemplary

damages in these other statutes can be said to reflect doubt

whether, without such reference, the term would necessarily

include exemplary damages. Under the broad and unequivocal

language in Franklin, however, the absence of an explicit

mention in the OSH Act would not seem enough to take from the

courts their "'"power to utilize any of the procedures or

actions normally available . . . according to the exigencies

of the particular case."'" Franklin, 112 S. Ct. at 1034

(quoting J.I. Case Co. v. Borak, 377 U.S. 426, 433-34 (1964),

in turn quoting Deckert v. Independence Shares Corp., 311

U.S. 282, 288 (1940)). Where Congress itself has recognized,

in these other statutes, that "all appropriate relief" may

include exemplary damages, it is difficult to see why the

-14-

mere omission of the specific reference should compel a

narrower reading.

Courts have traditionally had the power in tort

cases to award damages "larger than the amount necessary to

reimburse actual monetary loss sustained or even anticipated

by the plaintiff, and thus redress intangible elements of

injury that are 'deemed important, even though not pecuniary

in [their] immediate consequences[s].'" United States v.

Burke, 112 S. Ct. 1867, 1871 (1992) (quoting D. Dobbs,

Remedies 136 (1973)). And in circumstances where the

defendant's misconduct was intentional or reckless, "punitive

or exemplary damages are generally available." Id. at 1872

(citations omitted). See also Molzof v. United States, 112

S. Ct. 711, 715 (1992) (the Supreme Court's "decisions make

clear that the concept of 'punitive damages' has a long

pedigree in the law"); Rowlett v. Anheuser-Busch, Inc., 832

F.2d 194, 205 (1st Cir. 1987) ("[I]n jurisdictions where

punitive damages are authorized, punitive damages are within

the jury's discretion in cases requiring proof of intentional

wrongdoing.") (citing Smith v. Wade, 461 U.S. 30, 53-54

(1983)). Retaliatory discharge has been treated as an

intentional tort. See Travis v. Gary Community Mental Health

Ctr., 921 F.2d 108, 112 (7th Cir. 1990); see also W. Page

Keeton et al., Prosser and Keeton on the Law of Torts, 130,

at 1027-29 (5th ed. 1984).

-15-

Perhaps the strongest argument for distinguishing

Franklin, and deciding that punitive damages are not

available under 11(c) of the OSH Act, lies in certain aspects

of its legislative history and in the practice of not

awarding such damages under certain other federal statutes.

In the version of the OSH Act reported to the full Senate

from the Committee on Labor and Public Welfare, the Act

provided only for administrative action to obtain relief for

an employee discriminated against for asserting rights under

the Act. See S. Rep. No. 1282, 91st Cong. 2d Sess., 34-35

(1970), reprinted in Legislative History of the Occupational

Safety and Health Act of 1970, at 174-75 (1971) ("Legislative

History"); S. 2193, 91st Cong., 2d Sess., 10(f) (1970),

reprinted in Legislative History at 261; Conf. Rep. No. 1765,

91st Cong., 2d Sess., 39 (1970), reprinted in Legislative

History at 1192. This Senate version allowed employees who

believed they were discriminated against to apply to the

Secretary for an investigation of such alleged

discrimination. S. 2193, supra, 10(f). After appropriate

investigation, which could include a public hearing, the

Secretary was to make findings of fact. If the Secretary

found that a violation of the Act had occurred, the Secretary

was to order "the person committing such violation to take

such affirmative action to abate the violation as the

Secretary deems appropriate, including, but not limited to,

-16-

the rehiring or reinstatement of the employee to his former

position with back pay." Id. (emphasis added).

This language authorizing the Secretary to order

"such affirmative action" was similar to the language used in

the remedial provisions of both the National Labor Relations

Act ("the NLRA") and of Title VII of the Civil Rights Act of

1964 ("Title VII"). Section 10(c) of the NLRA authorizes the

National Labor Relations Board to investigate allegations of

unfair labor practices and, if the allegations are found to

be true, to order "such affirmative action including

reinstatement of employees with or without back pay, as will

effectuate the policies" of the Act. 29 U.S.C. 160

(emphasis added).

Similarly, 706(g) of Title VII authorizes courts

hearing a complaint of discrimination to "order such

affirmative action as may be appropriate, which may include,

but is not limited to, reinstatement or hiring of employees,

with or without back pay . . . or any other equitable relief

as the court deems appropriate." 42 U.S.C. 2000e-5

(emphasis added). This provision was expressly modeled after

10(c) of the NLRA. See Abermarle Paper Co. v. Moody, 422

U.S. 405, 419 & n.11 (1975); Robert Belton, Remedies in

Employment Discrimination Law 13.3 at 430 (1992).

The similarity of the Senate's early version of

what became 11(c) of the OSH Act to both 10(c) of the

-17-

NLRA and 706(g) of Title VII suggests that the Senate meant

to incorporate into its version of the OSH Act the same kinds

of remedies that were available under the NLRA and Title VII.

And in choosing such remedies, the Senate was presumably

aware that, as early as 1938, the Supreme Court had held that

punitive damages were not available under the NLRA.2

Consolidated Edison Co. v. NLRB, 305 U.S. 197, 235-36 (1938);

see also Republic Steel Corp. v. NLRB, 311 U.S. 7, 12 (1940).

The Court had interpreted the NLRA's language by explaining

that the power to command "affirmative action" was remedial

rather than punitive. Consolidated Edison, 305 U.S. at 236;

see also Republic Steel, 311 U.S. at 12.

Therefore, if this language allowing courts to

order "affirmative action" had been retained in the final

version of the OSH Act, we would be in a position similar to

those courts that have interpreted Title VII as not providing

for punitive damages, basing their decisions in part on the

fact that if punitive damages are not available under 10(c)

of the NLRA, they should not be available under statutes

modeled after that provision. See, e.g., Richerson v. Jones,

551 F.2d 918, 927 (3d Cir. 1977) (noting that "close

relationship" between Title VII provision and NLRA provision

2. At the time of the reporting of the Senate version in
October 1970, the provision of punitive damages under Title
VII had not been the subject of review by the Supreme Court
or any court of appeals. See Belton, supra at 13.3 nn.33-

34.

-18-

"provides additional evidence that Congress did not intend to

authorize" punitive damages under Title VII); Harrington v.

Vandalia-Butler Board of Education, 585 F.2d 192, 196-97 (6th

Cir. 1978), cert. denied, 441 U.S. 932 (1979); Walker v. Ford

Motor Co., 684 F.2d 1355, 1363-64 (11th Cir. 1982); see also

DeGrace v. Rumsfeld, 614 F.2d 796, 808 (1st Cir. 1980).

The final bill, however, was a product of

compromise between the Senate and House versions and did not

include the Senate language allowing only for "such

affirmative action" as the Secretary deemed appropriate. The

penalties in the House version of the OSH Act had been

different and stronger than those in the Senate version. The

House bill had called for civil and criminal penalties for

employers who discriminated against employee whistleblowers.

See Conf. Rep. No. 1765, supra, at 39. The final language,

making specific the jurisdiction of the district courts in

actions brought by the Secretary and allowing courts to

provide "all appropriate relief," emerged from a conference

committee.

One might argue, perhaps, that the substitution of

the phrase "all appropriate relief" for "such affirmative

action" evinced merely careless drafting rather than a

legislative intent to broaden the remedies available. The

conference report says nothing about an intent to broaden the

Senate's remedies. Nonetheless, there is a significant

-19-

and obvious distinction between the right to order the

offender "to take such affirmative action to abate the

violation as the Secretary deems appropriate, including

. . ." and authorizing a court "to order all appropriate

relief, including . . . ." The final bill was a product of

compromise the Senate allowed the Secretary to bring

causes of action in the district courts; the House gave up on

criminal penalties. In this atmosphere of "substantial give

and take," see 116 Cong. Rec. 42,200 (1970) (remarks of Rep.

Perkins), reprinted in Legislative History at 1200, it is

hardly obvious, where different language was used, that the

conference committee desired merely to transfer to a federal

court the exact same set of remedies the Senate gave to the

Secretary of Labor in its earlier version. Indeed, it would

seem inconsistent to assume, on the one hand, that Congress

intends to incorporate an entire remedial scheme when it uses

a term of art in a statute, see, e.g., Richerson, 551 F.2d at

927, but to assume that, on the other hand, when Congress

omits the term of art and adopts different language, that it

did so inadvertently.

Choice of the terminology "all appropriate relief"

suggests that Congress might have been looking more to the

language of the Labor-Management Reporting and Disclosure Act

of 1959, which outlines a "bill of rights" for union members,

29 U.S.C. 411(a), and provides that actions for violation

-20-

of those rights may be had to recover "such relief (including

injunctions) as may be appropriate." 29 U.S.C. 412. At

the time of the passage of the OSH Act, the only court of

appeals that had ruled on the issue had held that 29 U.S.C.

412 allowed for punitive damages. International Bhd. of

Boilermakers v. Braswell, 388 F.2d 193, 199-201 (5th Cir.),

cert. denied, 391 U.S. 935 (1968).3 If we were to presume

that the language of 11(c) was modeled after previous labor

legislation, the similarity to the language of the Labor-

Management Reporting and Disclosure Act of 1959 would support

our decision here.

We cannot find, therefore, in the legislative

history of the OSH Act any "clear direction" that the term

"all appropriate relief" was intended to deny to the courts

remedial powers to award compensatory and punitive damages in

a cause of action analogous to an intentional tort. See

Smith, 461 U.S. at 48-49 ("As a general matter, we discern no

reason why a person whose federally guaranteed rights have

been violated should be granted a more restrictive remedy

3. Other courts of appeals that have since ruled on the
issue are in agreement. See, e.g., Cooke v. Orange Belt

Dist. Council, 529 F.2d 815, 820 (9th Cir. 1976); Morrissey

v. National Maritime Union, 544 F.2d 19, 24-25 (2nd Cir.

1976); Keene v. IUOE Local 624, 569 F.2d 1375, 1381-1382, &

n.8 (5th Cir. 1978); see also International Bhd. of Elec.

Workers v. Foust, 442 U.S. 42, 47 n.9 (1979) (reserving

decision on this point).

-21-

than a person asserting an ordinary tort cause of

action.").4

We conclude, in accordance with the meaning of the

same words as used in Franklin, that the statutory power to

award "all appropriate relief" gave the district court

authority, where such relief is in fact appropriate, to award

compensatory and even such traditional other relief as

exemplary damages. That authority would be broad enough to

support an award of twice the employees' pay provided the

facts and circumstances of this case justified such an award

4. Cf. Individuals with Disabilities Education Act, 20

U.S.C. 1401-1485, which requires participating state and
local educational agencies "to assure that handicapped
children and their parents or guardians are guaranteed
procedural safeguards with respect to the provision of free
appropriate public education" to such handicapped children.
20 U.S.C. 1415(a). This procedural framework offers the
parents an opportunity to contest any decision made by the
state regarding the child's identification, evaluation, or
educational placement through appropriate administrative
procedures and, if necessary, in state or federal court. In
such civil actions, the court "shall grant such relief as the
court determines is appropriate." 20 U.S.C. 1415(e)(2).
Courts have split in determining whether this statute
allows for punitive damages. Cf. Marvin H. v. Austin Indep.

Sch. Dist., 714 F.2d 1348, 1356 (5th Cir. 1983) (procedural

focus of Act means that relief under 1415(e)(2) "generally
includes only prospective relief" and does not include
compensatory or punitive damages); Woods on behalf of T.W. v.

New Jersey Dept. of Educ., 796 F. Supp. 767, 776 (D.N.J.

1992) (punitive damages available); see also Burlington Sch.

Comm. v. Mass. Dept. of Educ., 471 U.S. 359, 369 (1985)

("ordinary meaning of these words [to 'grant such relief as
the court determines is appropriate'] confers broad
discretion on the court").

-22-

as additional compensation and as deserved punitive or

exemplary damages.

B.

Our final inquiry, then, is whether the court

abused its discretion in deciding on this record that double

damages relief was "appropriate," bearing in mind that

determination of the amount of damages "falls within the

sound judgment and discretion of the factfinder." Soto v.

United States, 11 F.3d 15, 18 (1st Cir. 1993).

Here, accepting the court's findings of fact which

we think were not clearly erroneous, we cannot say the award

was unreasonable. There was evidence that both Richardson

and Roche incurred monetary losses because of their

discharges in addition to their lost back pay. The district

court stated that a portion of the award covered prejudgment

interest, which, depending on the interest rate chosen by the

court, could itself amount to more than 35% of the back wages

owed.

In addition, the court concluded that the

defendant's conduct, "both in and out of court, [was]

consistently brash," suggesting a belief that exemplary

damages were in order. The court found that Cambridgeport

had intentionally retaliated against Richardson and had fired

Roche as an example to other employees. The court also noted

that its "general picture" of the defendant was informed by

-23-

the testimony of a Labor Department investigator who

testified that, during the Secretary's investigation of the

employees' termination, a member of Cambridgeport management

had offered the investigator a case of wine, possibly in an

attempt to influence the investigation. Moreover, the court

found that Cambridgeport during trial had revealed itself as

"a tough outfit" that "more than passively observed; it

supervised its witnesses." Given these findings, and the

conduct of the defendant as assessed by the court, the court

did not exceed its discretion in awarding double back pay

damages.

Affirmed. Costs to appellee.

-24-